[Cite as *State v. Metzger*, 2026-Ohio-404.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

SHAWN R. METZGER,

    DEFENDANT-APPELLANT.

CASE NO. 1-25-19

OPINION AND
JUDGMENT ENTRY

Appeal from Allen County Common Pleas Court
Trial Court No. CR2024 0189

Judgment Affirmed

Date of Decision: February 9, 2026

APPEARANCES:

    *Chima R. Ekeh* for Appellant

    *John R. Willamowski, Jr.* for Appellee

**WALDICK, J.**

{¶1} Defendant-appellant, Shawn R. Metzger ("Metzger"), appeals the May 5, 2025 judgment of conviction and sentence entered against him in the Allen County Court of Common Pleas, following a jury trial in which he was found guilty of three counts of Aggravated Trafficking in Drugs and one count of Engaging in a Pattern of Corrupt Activity. For the reasons set forth below, we affirm.

*Procedural History*

{¶2} This case originated on August 15, 2024, when an Allen County grand jury returned a four-count indictment against Metzger, charging him as follows: Count 1 – Aggravated Trafficking in Drugs, a second-degree felony in violation of R.C. 2925.03(A)(1) and (C)(1)(d); Count 2 – Aggravated Trafficking in Drugs, a second-degree felony in violation of R.C. 2925.03(A)(1) and (C)(1)(c); Count 3 – Aggravated Trafficking in Drugs, a second-degree felony in violation of R.C. 2925.03(A)(1) and (C)(1)(d); and Count 4 – Engaging in a Pattern of Corrupt Activity, a first-degree felony in violation of R.C. 2923.32(A)(1) and (B)(1).

{¶3} On August 26, 2024, an arraignment was held and Metzger entered a plea of not guilty to all counts in the indictment.

{¶4} On November 14, 2024, Metzger filed a motion to suppress the seizure of his cell phone, from which law enforcement had subsequently obtained evidence that could be used against him at trial. On January 10, 2025, a suppression hearing

was held. On February 10, 2025, the trial court filed a judgment entry overruling the motion to suppress.

{¶5} On April 23, 2025, the State of Ohio moved to amend Count 2 of the indictment, seeking to strike enhancing language therein alleging that the offense occurred in the vicinity of a substance addiction services provider or a recovering addict. By judgment entry filed that same date, the trial court granted that motion and Count 2 was amended to a third-degree felony.

{¶6} On April 28, 2025, a jury trial commenced in the case. During the course of the four-day trial, the prosecution presented the testimony of 10 witnesses and introduced 69 evidentiary exhibits. After the State of Ohio rested its case, Metzger moved for acquittal pursuant to Crim.R. 29, and that motion was overruled by the trial court. Metzger then opted to present no witnesses, but admitted one exhibit.

{¶7} Following closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation on May 1, 2025 at 3:54 p.m. At 5:53 p.m. on that same date, the jury returned verdicts finding Metzger guilty as charged in the amended indictment. The trial court accepted the verdicts and discharged the jury.

{¶8} On May 2, 2025, a sentencing hearing was held. The trial court sentenced Metzger as follows: Count 1 – a mandatory prison term of seven years; Count 2 – a prison term of 24 months; Count 3 – a mandatory prison term of seven

years; and Count 4 – a minimum prison term of eight years up to a potential maximum prison term of twelve years. The trial court ordered that the sentences imposed on Counts 1 and 2 would run concurrently, but that the sentences on Counts 1 and 2 would run consecutively to the sentences imposed on Counts 3 and 4.

{¶9} On May 5, 2025, the trial court journalized its sentencing orders.

{¶10} On May 22, 2025, Metzger filed the instant appeal.

*Summary of Evidence Presented at Trial*

{¶11} During the State of Ohio's case at trial, evidence was presented that in February of 2024, law enforcement officers assigned to the FBI Northwest Ohio Safe Streets Task Force and the West Central Ohio Crime Task Force conducted a drug-related investigation of Metzger, which included utilizing two confidential informants to make a total of three controlled drug buys in which Metzger was involved.

{¶12} Through the testimony of the task force officers and that of the confidential informants involved in the investigation, it was established that the first two controlled drug buys took place on February 22, 2024, and the third buy occurred on February 27, 2024. On each occasion, the confidential informant ("C.I.") and the vehicle driven by the C.I. were searched by officers prior to the buy, and no money, drugs, or other contraband were found. The C.I. was then issued a specific amount of cash, which the investigators had previously copied in order to record the serial numbers of the investigative funds being used. The C.I. was also

equipped each time with discreet electronic monitoring and recording equipment, commonly referred to as a "wire." While the C.I. was surveilled by the officers, both visually and electronically, the C.I. drove on each occasion to a pre-arranged location and met up with the person offering to sell the drugs at issue. Each time, the C.I. purchased methamphetamine, and then met up back up with the investigators immediately afterwards. The C.I. on each occasion turned over a bag of suspected methamphetamine to the officers. Another search of the C.I. and the C.I.'s vehicle was then conducted, confirming on every occasion that the C.I. had no other drugs and no money in their possession.

{¶13} Specifically, with regard to the first buy at issue, which related to Count 1 of the indictment, the evidence reflected that, in the early afternoon hours of February 22, 2024, task force officers worked with a C.I. named Heather Mewhorter to purchase two ounces of methamphetamine.

{¶14} After the pre-buy procedures detailed above were completed by the officers, the C.I. drove in her vehicle to 7330 Clum Road in Harrod, Ohio, to meet with a man identified as Mark Ruvoldt. While task force investigators surveilled both the C.I.'s movements and the area of 7330 Clum Road, the C.I. picked up Ruvoldt at that location.

{¶15} With the officers continuing to surveil the C.I.'s travels, the C.I. drove Ruvoldt to the Shawnee Fuel Stop in the area of Breese Road and Interstate 75 in Lima, Ohio, so that Ruvoldt could meet up with his supplier. On the way to the gas

station, the C.I. gave Ruvoldt the money needed to purchase the drugs. Just prior to arriving at the Fuel Stop, Ruvoldt could be heard over the wire saying that he was going to be meeting a guy named Shawn, and that Shawn typically drove a white car or a black truck.

{¶16} While observed by various investigators, the C.I. and Ruvoldt arrived at the gas station and parked near a black Chevrolet truck, where Metzger waited inside the truck. Ruvoldt exited the front passenger seat of the C.I.'s vehicle and got into the truck with Metzger. Ruvoldt remained in the black truck with Metzger for just a minute or two, then got out of the truck and returned to the C.I.'s vehicle and gave the C.I. a quantity of methamphetamine, contained in three plastic bags.

{¶17} The C.I. and Ruvoldt were followed by investigators as the C.I. drove back to 7330 Clum Road and dropped off Ruvoldt. The C.I. then met back up with the task force investigators, turned over the methamphetamine she had purchased, and the investigators completed the post-buy procedures.

{¶18} With regard to the second controlled buy at issue, which related to Count 2 of the indictment, the evidence reflected that, on February 22, 2024, after completing the initial controlled buy with C.I. Mewhorter, it came to the attention of the investigating officers that local law enforcement in Lima had another C.I., Christy Doyle, who could purchase drugs from Metzger and a suspect identified as Paige Snider. As a result, it was decided that the task force investigators would

work with Doyle on that same date to make a second controlled purchase of methamphetamine from Metzger.

{¶19} Task force officers then met with Doyle later that day, in order to purchase half an ounce of methamphetamine for $225.00. After the pre-buy procedures were completed, task force officers followed and surveilled the C.I. as she drove her vehicle to a Marathon gas station located at St. Johns and Hanthorn Roads on the south side of Lima. That meeting place had previously been arranged via texts between the C.I. and Paige Snider, who indicated that she would be arriving there with "Shawn" in a black Chevy truck. Once the C.I. arrived at the Marathon station, task force investigators watched and listened over the wire as Snider exited Metzger's black Chevrolet truck and walked to the driver's door of the C.I.'s vehicle. At that time, the C.I. and Snider had a brief conversation, during which the C.I. asked to travel with Snider and Metzger in the future to procure narcotics. Snider told the C.I. that they did not need to do that because Shawn was a supplier and he had drugs available. Snider then handed the C.I. a small plastic bag containing methamphetamine, and the C.I. gave Snider the cash that had been issued by the task force. After the transaction was completed, task force officers watched as Snider departed the C.I.'s vehicle and returned to the black Chevy truck. While the C.I. was at the Marathon station, Metzger was observed getting out of his truck and then standing next to it. Metzger also spoke to the C.I. upon arriving at the gas station.

{¶20} The C.I. was then followed by investigators as she drove away from the Marathon station. The C.I. met back up with the task force officers, turned over the methamphetamine she had purchased, and the investigators completed the post-buy procedures.

{¶21} The testimony at trial reflected that the following day, February 23, 2024, task force officer Derek Dennis obtained a search warrant authorizing the task force investigators to place a GPS tracking device on Metzger's black Chevrolet truck. The tracking device was then covertly placed on the truck while it was parked at Metzger's listed address of 1010 Race Street in Wapakoneta, Ohio. In doing prior visual checks of that address, Dennis had also observed a white Cadillac parked at that same location.

{¶22} On February 27, 2024, task force officers conducted a third controlled drug buy, which related to Count 3 of the indictment, again working with C.I. Christy Doyle, who had participated in the second buy on February 22nd.

{¶23} With regard to the third controlled buy, the evidence reflected that task force officers met with Doyle on February 27, 2024, in order to purchase approximately 35 grams of methamphetamine for $600.00. After the pre-buy procedures were completed, task force officers followed and surveilled the C.I. as she drove her vehicle to the Marathon gas station located at St. Johns and Hanthorn Roads in Lima, the same gas station where the second buy had occurred five days earlier. On the occasion of the third buy, the meeting place had been arranged via

Facebook Messenger messages between the C.I. and Metzger. Photographs of those messages contained in the C.I.'s cell phone were introduced into evidence at trial, and reflected conversation between the C.I. and Metzger about the quantity of drugs the C.I. would be purchasing, and the price thereof. That same message thread also referenced the $225.00 paid by the C.I. for half an ounce "the other day."

{¶24} Upon the C.I.'s arrival at the Marathon station on February 27th, she received a phone call from Metzger, who told her he would like to meet instead at a nearby Speedway gas station. The C.I. then drove to the Speedway station and met with Metzger. At that time, the C.I. received drugs in exchange for the task force funds she had been issued.

{¶25} The C.I. then left the Speedway station in her vehicle, followed by investigators who had been surveilling her the entire time and listening over the wire. The C.I. met back up with the task force officers, turned over the methamphetamine she had purchased, and the investigators completed the post-buy procedures.

{¶26} On February 28, 2024, the GPS monitoring system on Metzger's truck reflected that the truck had traveled to the Piqua, Ohio area, stopped at a location there for approximately half an hour, and then began driving northbound on Interstate 75, back towards Wapakoneta, Ohio. Based on that activity, and information received by task force officers, it was believed by the investigators that a drug transaction had occurred. For that reason, officers then set up surveillance

in Auglaize County, with the goal of intercepting the black truck when it returned to Wapakoneta.

{¶27} Once the black truck returned to Wapakoneta, a traffic stop was attempted on the truck by Joe Welker, a uniformed patrol officer employed by the Wapakoneta Police Department. At that time, it was confirmed that Metzger was driving the black truck. While being tailed, Metzger pulled over to let a passenger out of the truck, which was when Welker pulled up by Metzger's truck and activated the cruiser's light-bar. In response, Metzger fled in the truck. A brief vehicle pursuit followed, but ended when Metzger abandoned the truck in a trailer park in Wapakoneta, and then fled on foot. Metzger was apprehended in the area shortly thereafter and was placed under arrest. After a police canine alerted to the odor of narcotics in the vehicle abandoned by Metzger, a search of that truck was conducted by investigators, resulting in a cell phone being discovered on the driver's side floorboard. Officers seized the cell phone as potential evidence.

{¶28} Subsequently, a search warrant was granted that authorized an extraction of the data contained in that phone. That data extraction was then performed by Detective Matt Woodworth of the Lima Police Department. After the extraction was completed pursuant to the search warrant, the phone was returned to Metzger, who signed a property form acknowledging the return of his cell phone to him.

{¶29} At trial, Detective Woodworth testified as to the data extraction he had performed on Metzger's cell phone. Among the information found in that cell phone were text messages sent during the month of February, 2024, from that phone to the phone of another person, identified in first phone's contacts as "Marky Mark." Those text messages reflected communications about more than one meeting at the Shawnee Fuel Stop, and discussion about "sales" and the prices of the product being sold. The messages also contained conversation about "cooking", which Woodworth testified is a term relating to the making of methamphetamine. There was also a message sent from "Marky Mark" to Metzger's phone on February 22, 2024, in which the sender asked, "Can you plz have 2 for me right around 1230?", in response to which the text sent from Metzger's phone said, "Yep."

{¶30} Finally, the State of Ohio presented evidence at trial that, subsequent to Metzger's arrest, the suspected methamphetamine purchased by the C.I.s in the three controlled buys was sent to the Ohio Bureau of Criminal Investigation ("BCI"), for weighing and testing by forensic scientists at the BCI lab. The substance purchased during the first buy on February 22, 2024 was weighed and tested by Kelsie Pestello, who testified at trial that the substance weighed 56.5 grams, plus or minus .05 grams, and was found to contain methamphetamine following chemical testing and instrumental analysis. The substance purchased during the second buy on February 22, 2024 was weighed and tested by Kristin Canfield, who testified that the substance weighed 13.84 grams, plus or minus .04

grams, and was found to contain methamphetamine following chemical testing and instrumental analysis. Canfield also weighed and tested the substance purchased during the February 27, 2024 buy, and she testified that the substance weighed 35.16 grams, plus or minus .05 grams, and was found to contain methamphetamine following chemical testing and instrumental analysis.

*Assignments of Error Raised on Appeal*

**First Assignment of Error**

**The trial court erred in denying appellant's motion to suppress.**

**Second Assignment of Error**

**The trial court erred by preventing the defense from impeaching the state's witnesses.**

**Third Assignment of Error**

**Appellant's convictions and sentences for Counts I and II were not supported by legally sufficient evidence.**

**Fourth Assignment of Error**

**Appellant's convictions and sentences were against the manifest weight of the evidence.**

**Fifth Assignment of Error**

**The trial court erred in failing to sustain appellant's motion for acquittal on Count IV.**

**Sixth Assignment of Error**

**The trial court erred in qualifying Kelsie Pestello as an expert witness.**

*Analysis of Assignments of Error*

*First Assignment of Error*

**{¶31}** In the first assignment of error, Metzger asserts that the trial court erred in overruling the motion to suppress filed with regard to the cell phone seized by law enforcement from the vehicle driven by Metzger.

**{¶32}** As to this issue, the record reflects that Metzger filed a motion to suppress on November 14, 2024, in which he sought the exclusion of evidence stemming from a cell phone alleged by Metzger to have been seized from him by law enforcement, without a warrant, on February 28, 2024.

**{¶33}** On January 10, 2025, a suppression hearing was held. At the hearing, the State of Ohio presented the testimony of Officer Derek Dennis of the New Bremen Police Department, who was assigned to the Northwest Ohio Safe Streets Task Force, and that of Officer Joseph Welker of the Wapakoneta Police Department. The prosecution also introduced in evidence the training certificates for Officer Welker and his police canine, Fox. The defense then presented brief testimony from Metzger in support of the motion.

**{¶34}** On February 10, 2025, the trial court filed a judgment entry overruling the motion to suppress. In that opinion, the trial court held that Metzger lacked standing to challenge the seizure of the phone, based on the trial court's finding that Metzger had voluntarily abandoned the phone, and the vehicle in which it was

located, prior to the phone being recovered by law enforcement. The trial court also held that, even if Metzger had standing, the automobile exception to the search warrant requirement was applicable to the case. On both of those bases, the trial court denied the motion to suppress.

{¶35} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson,* 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts,* 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside*, at ¶ 8.

{¶36} In the instant case, the parties do not dispute that a warrant to search the vehicle at issue and to seize any of its contents was not issued prior to the search of the truck by law enforcement on February 28, 2024.

{¶37} In support of the warrantless search and seizure, Officer Dennis testified at the suppression hearing that, in February of 2024, he and other officers working with the Northwest Ohio Safe Streets Task Force became involved in an investigation of Metzger. As part of that investigation, two separate controlled drug buys using two different confidential informants were conducted by the task force

on February 22, 2024. Metzger was present during both of those buys and was observed by officers to be driving a black Chevrolet truck. Dennis testified that on February 23, 2024, he obtained a warrant authorizing the placement of a GPS tracking device on the black Chevy truck and the GPS unit was then placed on that truck. On February 27, 2024, task force officers conducted another controlled drug buy involving Metzger, who on that occasion was driving a white Cadillac. During that third controlled buy, the confidential informant contacted Metzger via Facebook Messenger and by calling Metzger on his cell phone.

{¶38} On February 28, 2024, officers were actively monitoring the GPS unit that had been installed on the black truck, and the unit indicated that the truck was being driven from Wapakoneta to a location in Piqua, Ohio where suspected narcotics activities had previously taken place. As the investigators continued to remotely monitor the truck's location, it returned to the Wapakoneta area. Once the truck was back inside the Wapakoneta city limits, Officer Dennis began following the truck in person. Dennis observed that it was Metzger who was driving the truck at that time. Officer Dennis was in an unmarked vehicle while following Metzger, and so Dennis contacted Patrolman Welker of the Wapakoneta Police Department so that Welker could stop the truck and initiate contact with Metzger. On his own accord, Metzger then stopped the truck in the 500 block of Court Street in Wapakoneta to let out a passenger, at which time Patrolman Welker pulled up to make the traffic stop. Once Metzger observed Patrolman Welker in his cruiser,

-15-

Metzger took off in the truck, and Welker began pursuing him. Officer Dennis testified that Metzger ultimately abandoned the black truck in a Wapakoneta-area trailer park, leaving the truck in between two trailers with the driver's door open and the engine still running. Once Metzger abandoned the truck, a foot pursuit occurred and he was located a short time later behind a nearby house. Metzger was taken into custody for driving under suspension and for fleeing from law enforcement. Officer Dennis testified that Patrolman Welker then utilized his police canine and had the dog perform a free air sniff of Metzger's vehicle. Dennis was notified by Welker that the dog positively alerted to the truck. As a result, a search was performed on the truck. During that search, Dennis located a cell phone on the driver's side floorboard, and seized the cell phone as evidence relating to the narcotics investigation and to the fleeing offense that had just occurred.

{¶39} At the suppression hearing, Patrolman Welker testified that he had been employed by the City of Wapakoneta Police Department for approximately eighteen years and had been a K-9 handler for the department for thirteen to fourteen years. At the time of the hearing, Welker had been working with a canine partner named Fox for nearly five years. In February of 2024, Fox had an active certification through the State of Ohio for both patrol work and narcotics detection.

{¶40} Patrolman Welker testified that on the afternoon in question, he was contacted by Officer Dennis and asked to participate in a stop of a vehicle being driven by Metzger. Welker was in a marked cruiser that day and he began to circle

-16-

the area in which Metzger was driving. Metzger stopped on Court Street and a passenger was getting out of Metzger's vehicle when Patrolman Welker pulled up. Welker pulled in front of Metzger's truck and activated the lights on the cruiser. In response, Metzger looked at Welker and then took off in the truck. Welker got back into his cruiser and began pursuing Metzger's truck. A short time later, Patrolman Welker located the truck abandoned in a nearby trailer park, with the truck still running and the driver's door open. Welker testified that the truck was not parked in a driveway but, rather, in the grass between two trailers. Welker got his dog out of the cruiser and proceeded to run after Metzger on foot. Ten to fifteen minutes later, Welker and two other officers located Metzger behind a house in a nearby subdivision.

{¶41} After Metzger was taken into custody, Patrolman Welker returned to the location of the truck and had his canine, Fox, conduct a free air sniff of the vehicle. While walking Fox around the truck, Fox alerted to the presence of the odor of a controlled substance in the truck. The truck was then searched by several officers at the scene. After the search of the truck was concluded, the abandoned truck was impounded by police because of where it had been parked, along with the fact that Metzger was not the registered owner and did not have a valid driver's license.

{¶42} At the suppression hearing, Metzger then testified on his own behalf. Metzger acknowledged that he had been driving the black truck on the date

-17-

in question and that, while fleeing from police, he ran away from the vehicle, leaving the vehicle's door open and the truck running. However, Metzger testified that he thought his phone was in his pocket and that he did not intentionally leave it in the truck. Metzger also testified that his phone had a four-digit passcode that had to be entered in order to use the phone.

{¶43} Based on that evidence, the trial court found that Metzger had voluntarily abandoned the vehicle and all contents therein. Specifically, the trial court made the following factual findings in overruling the motion to suppress:

> Although [Metzger] thought the phone was in his pocket, the reality of life is that objects fall out of pockets on a regular basis. This is especially true when a driver is fleeing the police in a vehicle, quickly exits the vehicle, and subsequently flees on foot. The defendant voluntarily made the decision to run off and leave his vehicle and its contents behind.

(Feb. 10, 2025 Judgment Entry on Motion to Suppress, Docket No. 74).

{¶44} Our review of the trial court's findings of fact, based on the evidentiary record before the trial court, reflects that the lower court's findings are supported by competent, credible evidence presented at the suppression hearing and, therefore, we must accept those findings. *State v. Roberts*, *supra*, at ¶ 100.

{¶45} As required, we now turn to a de novo review of the application of the law to those facts. *State v. Burnside*, *supra*, at ¶ 8.

> As this Court set forth in *State v. Dailey*, 2010-Ohio-4816 (3d Dist.):
>
> The Fourth and Fourteenth Amendments to the United States Constitution generally prohibit warrantless searches and seizures, and

any evidence that is obtained during an unlawful search or seizure will be excluded from being used against the defendant. *Mapp v. Ohio* (1961), 367 U.S. 643, 649, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 86 Ohio Law Abs. 513. At a suppression hearing, the State bears the burden of establishing that a warrantless search and seizure falls within one of the exceptions to the warrant requirement, and that it meets Fourth Amendment standards of reasonableness. *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, at paragraph two of the syllabus; *State v. Kessler* (1978), 53 Ohio St.2d 204, 207, 373 N.E.2d 1252; *City of Maumee v. Weisner* (1999), 87 Ohio St.3d 295, 297, 729 N.E.2d 507, 1999 Ohio LEXIS 3816, citing 5 LaFave, Search and Seizure (3 Ed.1996), Section 11.2(b).

Nevertheless, "[i]t has long been settled that '[a] defendant has no standing under the Fourth Amendment to the United States Constitution to object to a search and seizure of property that he has voluntarily abandoned'." *State v. Russell*, 2nd Dist. No. 21458, 2007 Ohio 137, P21, quoting *State v. Freeman* (1980), 64 Ohio St.2d 291, 414 N.E.2d 1044, paragraph two of the syllabus. The Ohio Supreme Court has further explained:

'Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.'

*Freeman*, 64 Ohio St.2d at 296, quoting *United States v. Colbert* (C.A.5, 1973), 474 F.2d 174, 176, internal citations omitted. The State also bears the burden of establishing, by a preponderance of the evidence, that the defendant abandoned the property at issue. *State v. Dennis*, 182 Ohio App.3d 674, 2009 Ohio 2173, 914 N.E.2d 1071, P41, citing *State v. Dubose*, 164 Ohio App.3d 698, 2005 Ohio 6602, 843 N.E.2d 1222, P43.

*Id.*, at ¶¶ 14-15.

{¶46} In the instant case, Metzger – in a clear attempt to escape being stopped or detained by the police – deliberately chose to abandon the vehicle, which was not owned by him, leaving both the truck and its contents behind. The truck was not locked, or otherwise left in a secured fashion in a public parking location; rather, the truck was abruptly ditched in someone's yard, with the ignition running and the driver's door hanging open. As a result, we find that Metzger no longer retained a reasonable expectation of privacy with regards to the cell phone left behind in that truck, and the trial court did not err in ruling that Metzger lacked standing to challenge the warrantless seizure of the phone.

{¶47} Alternatively, assuming arguendo that Metzger has standing to challenge the seizure of the phone, we agree with the trial court's determination that the automobile exception to the search warrant requirement is applicable here.

As this Court explained in *State v. Parsons*, 2017-Ohio-1315 (3d Dist.):

"A warrantless search of an automobile, where police officers have probable cause to believe such vehicle contains contraband, is one of the well-recognized exceptions to the constitutional requirement of a search warrant." *State v. James*, 5th Dist. Muskingum No. CT2015-0059, 2016-Ohio-7660, ¶ 23. "This 'automobile exception' allows a police officer to conduct a warrantless search of portions of a motor vehicle provided he or she has probable cause to believe it contains evidence of a crime." *Id.*, citing *Carroll v. United States*, 267 U.S. 132, 158-159, 45 S.Ct. 280, 69 L. Ed. 543, T.D. 3686 (1925). *See also State v. Turner*, 2nd Dist. Montgomery No. 27065, 2016-Ohio-7983, ¶ 24, 74 N.E.3d 858 ("'The police must have "probable cause" to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search.'"), quoting *State v. Kessler*, 53 Ohio St.2d 204, 208, 373 N.E.2d 1252 (1978), citing *Dyke v. Taylor Implement Mfg. Co.*, 391 U.S. 216, 221,

88 S.Ct. 1472, 20 L. Ed. 2d 538 (1968). "Probable cause is 'a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction.'" *Turner* at ¶ 24, quoting *Kessler* at 208, citing *Carroll* at 149.

*Id.*, at ¶ 24.

**{¶48}** Additionally, the exterior sniff of a vehicle by a trained narcotics dog to detect the odor of drugs is not a search within the meaning of the Fourth Amendment to the Constitution. *State v. Haley*, 2022-Ohio-2188, ¶ 9 (3d Dist.). Further, "[i]t is well established that if a trained narcotics dog 'alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband.'" *State v. Bunley*, 2005-Ohio-1922, ¶ 12 (3d Dist.), quoting *State v. French*, 104 Ohio App.3d 740, 749 (12th Dist. 1995).

**{¶49}** Finally, the "plain view doctrine" is another well-established exception to the search warrant requirement. *State v. Urdiales*, 2015-Ohio-3632, ¶ 28 (3d Dist.), citing *Stone v. City of Stow*, 64 Ohio St.3d 156, 164 (1992). Under the plain-view exception, "police may *seize* evidence in plain view during a lawful search if: (1) the seizing officer is lawfully present at the place from which the evidence can be plainly viewed; (2) the seizing officer has a right of access to the object itself; and (3) the object's incriminating character is immediately apparent." (Emphasis *sic*.) *State v. Burroughs*, 2020-Ohio-4417, ¶ 16 (3d Dist.)

**{¶50}** In the case before us, the certified narcotics-sniffing canine alerted to the odor of drugs in the truck driven by Metzger, giving the officers probable cause

to search that vehicle. It was also reasonable for the officers to believe that, at a minimum, the vehicle would contain evidence (keys, wallet, phone, DNA evidence, the vehicle's registration, etc.) related to Metzger's fleeing from a uniformed police officer, which is a crime. See R.C. 2921.331. Accordingly, for either or both of those reasons, in light of the automobile exception to the search warrant requirement, the officers were not required to obtain a search warrant to search the truck once probable cause had been established.

{¶51} That search then resulted in officers observing a cell phone on the driver's side floorboard. Given the nature of cell phones and the data they generate and store and, in particular, given the fact that Metzger had communicated with the C.I. via cell phone during the controlled buy one day earlier, we find that the phone was properly collected under the plain view exception as evidence in both the drug trafficking investigation and the fleeing investigation that the officers were conducting.

{¶52} In summary, after reviewing the record and the applicable law, the trial court did not err in overruling Metzger's motion to suppress.

{¶53} The first assignment of error is overruled.

*Second Assignment of Error*

{¶54} In the second assignment of error, Metzger argues that his trial counsel should have been permitted to cross-examine one of the state's law enforcement witnesses at trial about the fact that one of the confidential informants utilized in

this case had, well after the events at issue here, been charged with criminal offenses unrelated to the instant case.

{¶55} Specifically, Metzger argues here that the trial court committed reversible error when it prevented the defense from cross-examining Officer Derek Dennis with respect to what Metzger claims was an inaccurate statement made by Dennis on the witness stand, relating to whether another prosecution witness, Christy Doyle, had criminal charges pending against her at the time of trial.

{¶56} At trial, Officer Dennis testified that, on February 27, 2024, immediately following the completion of the third controlled drug buy at issue in this case, the C.I. involved in that buy, Christy Doyle, showed her cell phone to Dennis. The phone contained Facebook Messenger messages relevant to the buy, reflecting communications between Doyle and a Facebook account identified as Metzger's. Dennis testified that he then photographed the messages that he viewed in Doyle's phone. Those photographs were subsequently introduced at trial by the prosecution, after being identified by Dennis on the witness stand.

{¶57} During cross-examination, defense counsel questioned Officer Dennis about the messages in Doyle's phone that he had viewed and photographed on February 27, 2024. During that line of questioning, defense counsel suggested to Dennis that actually seizing the phone would have been a better approach than documenting the messages with photographs, in response to which Dennis indicated that he had returned the phone to Doyle. Defense counsel then again asked,

"Wouldn't it be a good idea to have that actual phone?" (Tr., 555). Dennis answered, "Sure. That's [*sic*] be nice to have it, but the informant is not a suspect in any criminal investigation and I just can't go around to…" (Tr., 555). Before Dennis finished his answer, defense counsel interrupted and asked, "Really? Wasn't the, wasn't this exact informant arrested…", at which point the prosecution objected to the question about Doyle having been arrested. (Tr., 555-556). The jury was then excused from the courtroom, to enable counsel to argue the objection to the trial court.

{¶58} In support of the objection, the State of Ohio argued that it sounded as if defense counsel was seeking to cross-examine the witness about Doyle having subsequently been arrested, but not yet convicted, for certain criminal offenses. The prosecutor noted that Doyle, at the time of trial, was in custody in Putnam County, Ohio for charges relating to the possession of drugs and tampering with evidence, with those Putnam County offenses alleged to have occurred in May of 2024, and an indictment returned thereon in June of 2024, dates well after the events at issue in this case. Because Doyle had not been convicted of those alleged crimes, the prosecutor asserted that cross-examining Officer Dennis about Doyle's arrest was improper impeachment under the rules of evidence and, further, that Dennis was not the appropriate witness through which to attempt to impeach Doyle's character for any conviction, had there been one.

{¶59} In response, defense counsel argued that he should be permitted to cross-examine Officer Dennis on his statement that Doyle was not a suspect in any crimes and, further, that such cross-examination about Doyle's subsequent arrest was relevant to Doyle's credibility.

{¶60} After much argument by defense counsel, the trial court sustained the state's objection. In so ruling, the court noted that defense counsel was taking Officer Dennis's testimony out of context, as the officer's statement sought to be impeached referred to Doyle's status of not being a suspect in any crimes at the time the photographs were taken of her phone, which was what he had been asked about by defense counsel. The trial court also found no merit to defense counsel's other arguments in support of the admissibility of the fact that Doyle had been charged, but not convicted, of unrelated crimes. In sustaining the objection, the trial court ruled that defense counsel was permitted to cross-examine Officer Dennis about photographing the messages instead of taking the phone into evidence, but that the officer could not be cross-examined about the fact that Doyle had been arrested for unrelated crimes that allegedly occurred several months after the investigation at issue had been completed.

{¶61} On appeal, Metzger argues that the trial court prejudicially erred in not permitting Metzger's trial counsel to impeach Officer Dennis with respect to the statement he made that Christy Doyle was not the suspect in any crime. Metzger asserts that evidence of Doyle's subsequent arrest should have been deemed

admissible, arguing that "[t]he precluded evidence was material, in that it would have undermined the reliability of Officer Dennis's testimony as well as the credibility of Ms. Doyle." (Merit Brief of Defendant-Appellant, p. 13).

{¶62} "'The Sixth Amendment's right to confront witnesses guarantees a criminal defendant the right to cross-examine witnesses.'" *State v. Glaeser*, 2025-Ohio-2386, ¶ 73 (3d Dist.), quoting *City of Cleveland v. Hyppolite*, 2016-Ohio-7399, ¶ 33 (8th Dist.). "While the Confrontation Clause requires the accused to have an 'opportunity for effective cross-examination,' it does not require trial courts to allow 'cross-examination . . . in whatever way and, to whatever extent, the defense might wish.'" *Glaeser*, at ¶ 73, quoting *State v. Bump*, 2013-Ohio-1006, ¶ 89 (3d Dist.). See, also, *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

{¶63} "Evid.R. 611 addresses the authority of a trial court 'to control the mode and order of cross-examination.'" *Glaeser*, at ¶ 73, quoting *State v. Holmes*, 2019-Ohio-2485, ¶ 55 (3d Dist.). Evid.R. 611 provides, in relevant part:

> (A) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
>
> (B) Scope of cross-examination. Cross-examination shall be permitted on all relevant matters and matters affecting credibility.

{¶64} "Thus, trial courts may 'impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice,

confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Glaeser*, at ¶ 74, quoting *State v. McAlpin*, 2022-Ohio-1567, ¶ 151.

{¶65} Under Evid.R. 607(A), a party is permitted to attack the credibility of a witness for impeachment purposes. The questioner must have a "reasonable basis for asking any question pertaining to impeachment that implies the existence of an impeaching fact." Evid.R. 607(B).

{¶66} Under Evid.R. 609(A)(1), "[s]ubject to Evid.R. 403, evidence that a witness other than the accused has been *convicted* of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the witness was *convicted*. (Emphasis added.) Additionally, pursuant to Evid.R. 609(A)(3), "[n]otwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that any witness, including an accused, has been *convicted* of a crime is admissible if the crime involved dishonesty or false statement, regardless of the punishment and whether based upon state or federal statute or local ordinance." (Emphasis added.)

{¶67} Finally, "'[i]t is well settled that "[t]he trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court."'" *State v. Nicholson*, 2025-Ohio-2639, ¶ 12 (3d Dist.), quoting *State v. Barnes*, 94 Ohio St.3d 21, 23 (2002), quoting *State v.*

*Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion is a decision that is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶68} In the instant case, to the extent that Metzger argues that the precluded cross-examination was relevant to Doyle's credibility, the attempt to introduce evidence that Doyle may have been facing charges for unrelated crimes (as opposed to having been convicted of the same) was an impermissible attempt to impeach the witness's credibility through the cross-examination of a different witness. Moreover, even had the questioning been directed at Doyle directly, the admissibility of such impeachment evidence requires that a conviction has occurred. For those reasons, the trial court did not abuse its discretion in refusing to allow cross-examination of Dennis on the topic of Doyle's arrest for purposes of impeaching Doyle's credibility.

{¶69} To the extent that Metzger asserts that the precluded cross-examination was relevant to the credibility of Officer Dennis, Metzger's entire argument here is based on the fact that Officer Dennis's statement at trial, "Sure. That's [*sic*] be nice to have it, but the informant is not a suspect in any criminal investigation and I just can't go around to…" was phrased in the present tense. Metzger seized upon that fact at trial, and does the same on appeal, to suggest that Dennis could therefore be cross-examined about his knowledge of Doyle being a suspect in crimes subsequent to the time he photographed the text messages.

{¶70} However, notwithstanding Dennis's use of the present tense in his answer, it is clear from a review of the testimony in context that his statement related to Doyle not being a suspect in any crimes at the time he photographed her text messages on February 27, 2024, not at some later date, up to and including the time of trial. Accordingly, the trial court did not abuse its discretion in declining to permit Metzger's trial counsel to cross-examine Dennis about his knowledge of Doyle being a suspect in unrelated crimes alleged to have been committed months after the events at issue in this case.

{¶71} The second assignment of error is overruled.

*Third and Fourth Assignments of Error*

{¶72} In the third and fourth assignments of error, Metzger raises challenges relating to his convictions on Counts 1 and 2 of the indictment. Specifically, in the third assignment of error, Metzger argues that his convictions on Counts 1 and 2 for Aggravated Trafficking in Drugs were not based on sufficient evidence. In the fourth assignment of error, Metzger argues that his convictions on Counts 1 and 2 for Aggravated Trafficking in Drugs were against the manifest weight of the evidence. As those two assignments of error both require a review of the evidence presented at trial in light of the challenged statutory elements of the crime at issue in Counts 1 and 2, albeit with differing standards of review, we shall jointly address the assignments of error.

**{¶73}** It is well established that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, paragraph two of the syllabus (1997).

**{¶74}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, paragraph two of the syllabus (1991). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "'In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact.'" *State v. Williams*, 2024-Ohio 2307, ¶ 21 (3d Dist.), quoting *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

**{¶75}** By contrast, when determining whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, *supra*, at 387. In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created

such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must still allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. Stewart*, 2023-Ohio-253, ¶ 11 (3d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

{¶76} In the instant case, Metzger was convicted on Counts 1 and 2 of separate incidents of Aggravated Trafficking in Drugs in violation of R.C. 2925.03(A)(1), which provides in relevant part that "[n]o person shall knowingly * * * [s]ell or offer to sell a controlled substance[.]" In Count 1, the indictment further alleged, and the jury found beyond a reasonable doubt, that the controlled substance trafficked by Metzger was methamphetamine in an amount equal to or exceeding five times the bulk amount but less than fifty times the bulk amount. In Count 2, the indictment further alleged, and the jury found beyond a reasonable doubt, that the controlled substance trafficked by Metzger was methamphetamine in an amount equal to or exceeding the bulk amount but less than five times the bulk amount.

{¶77} In the assignments of error raised on appeal concerning the sufficiency and weight of the evidence as to Counts 1 and 2, Metzger does not contend that the

State of Ohio failed to prove that the basic elements of the crime alleged in each count were committed as charged, nor does he challenge the evidence establishing that the substance was methamphetamine or the weight thereof. Rather, Metzger's challenge under both assignments of error is that the prosecution failed to prove that he committed the crimes at issue in those counts or, more specifically, that he personally sold or offered to sell the methamphetamine that was trafficked in the incidents relating to Counts 1 and 2.

With respect to identity, the Supreme Court of Ohio has stated as follows:

> Every criminal prosecution requires proof that the person accused of the crime is the person who committed the crime. This truism is reflected in the state's constitutional burden to prove the guilt of "the accused" beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Like any fact, the state can prove the identity of the accused by "circumstantial or direct" evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991).

*State v. Tate*, 2014-Ohio-3667, ¶ 15.

{¶78} We also note that "[c]ircumstantial evidence is not less probative than direct evidence." *State v. Bell*, 2025-Ohio-2489, ¶ 24 (3d Dist.), citing *State v. Dunn*, 2024-Ohio-5742, ¶ 32. "In fact, circumstantial evidence may be even more reliable than direct evidence in some instances." *Id.* "Moreover, jurors are free to rely on their common sense and experience in drawing reasonable inferences from the evidence." *Id.*

{¶79} In the instant case, Metzger specifically argues in the third assignment of error that his convictions on Counts 1 and 2 are not supported by sufficient evidence because, while he may have been present during the sales of the methamphetamine during both controlled drug buys on February 22, 2024, he claims the evidence was insufficient to establish his participation in those sales. In support of his claim, Metzger points to the fact that, on each occasion at issue, the confidential informant exchanged money for drugs with a person other than Metzger.

{¶80} Following this Court's thorough review of the trial record, we find Metzger's contentions regarding the sufficiency of the evidence on Counts 1 and 2 to lack merit. Viewing the evidence presented in the light most favorable to the prosecution, we find that a rational trier of fact could have found Metzger's participation in, and therefore guilt of the crimes, proven beyond a reasonable doubt.

{¶81} In reaching that decision, we note that the trial record reflects an abundance of evidence establishing that Metzger "sold or offered to sell" methamphetamine to the C.I. on the occasions at issue in Counts 1 and 2, particularly as the statutory definition of "sale" applicable to drug crimes includes "delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee." R.C. 3719.01(U). See, also, R.C. 2925.019(A).

{¶82} As to Count 1, the evidence at trial established that Mark Ruvoldt was the person who directly sold the two ounces of methamphetamine to confidential informant Heather Mewhorter on February 22, 2024. As detailed above, Mewhorter on that date ultimately received two ounces of methamphetamine from Ruvoldt in exchange for the cash she gave him. However, the evidence further established that, in order to obtain those drugs, the C.I. initially drove to 7330 Clum Road in Harrod, Ohio, where she picked up Ruvoldt in order to drive him to the Shawnee Fuel Stop to meet his supplier. Just prior to arriving at the Fuel Stop, Ruvoldt was heard over the wire saying that he was going to be meeting a guy named Shawn, and that Shawn typically drove a white car or a black truck. Additionally, while the C.I. paid Ruvoldt for the drugs upon picking him up, Ruvoldt did not provide the methamphetamine to the C.I. until after they went to the Fuel Stop and after Ruvoldt met with Metzger inside Metzger's truck cab. The evidence also established that the methamphetamine Mewhorter received from Ruvoldt was contained in rather unique yellow plastic packaging, which turned out to be the same type and color of packaging containing the methamphetamine purchased from Metzger by a different C.I. later on that same date.

{¶83} In addition to that evidence of Metzger's presence during, and participation in, the drug transaction at issue in Count 1, the State of Ohio also introduced in evidence a history of text messages between Metzger's cell phone and that of a person identified in Metzger's phone contact list as "Mark", which is

Ruvoldt's first name. The content of those text conversations, which occurred in February of 2024, further tended to establish that it was Ruvoldt who was communicating with Metzger in those text messages. Those messages reflected communications between Ruvoldt and Metzger's phone about multiple meetings at the Shawnee Fuel Stop, as well as repeated discussion of "sales", sale prices, and the payment of money. Of particular note with regard to Count 1 of the indictment, which related to a purchase of two ounces of methamphetamine, there was a message sent from Ruvoldt's phone to Metzger's phone on the date of the transaction, February 22, 2024, but prior to the drug sale, in which the sender asked, "Can you plz have 2 for me right around 1230?", in response to which the text sent from Metzger's phone said, "Yep."

{¶84} As to Count 2, the evidence at trial overwhelmingly established that Paige Snider was the person who directly sold the methamphetamine to confidential informant Christy Doyle in the second controlled buy that occurred on February 22, 2024. As detailed above, task force officers worked with Doyle on that occasion to purchase half an ounce of methamphetamine for $225.00 from Snider and Metzger. During that controlled buy, task force officers followed and surveilled Doyle as she drove to the Marathon gas station located at St. Johns and Hanthorn Roads on the south side of Lima. That meeting place had previously been arranged via texts between Doyle and Paige Snider, who indicated in those messages that she would be arriving there with "Shawn" in a black Chevy truck. Photographs of the

messages sent between Doyle and Snider on that date were introduced in evidence at trial, and reflect that Snider more than once mentioned being with "Shawn" while on her way to meet Doyle, and also referenced Shawn's involvement in the drug sale that the two women had arranged.

{¶85} Once Doyle arrived at the Marathon station, Metzger was observed getting out of his black truck and then standing next to it. Metzger also spoke to Doyle upon arrival at the gas station. Then, task force investigators watched and listened over the wire as Snider exited Metzger's black Chevrolet truck and walked to the driver's door of the Doyle's vehicle. At that time, Doyle and Snider had a brief conversation, during which Doyle asked to travel with Snider and Metzger in the future to procure narcotics. In response, Snider indicated that they did not need to do that because Shawn was a supplier and he had drugs available. Snider then handed Doyle a small plastic bag containing methamphetamine, and Doyle gave Snider the cash that had been issued by the task force. After the transaction was completed, task force officers watched as Snider departed the area of Doyle's vehicle and returned to the black Chevy truck driven by Metzger.

{¶86} In addition to that evidence of Metzger's presence at, and participation in, the drug transaction at issue in Count 2, the State of Ohio presented the testimony of Paige Snider at trial. Snider testified that she had known Metzger for a long time and that the two had been dating in February of 2024. Snider further testified that, in February of 2024, she was selling methamphetamine, which she obtained from

Metzger. As to the transaction at issue in Count 2, Snider testified that, on February 22, 2024, she sold methamphetamine to Christy Doyle and that Metzger had supplied the drugs that were sold. At trial, Snider also identified copies of text messages between herself and Metzger on that date, in which the two discuss the planned meeting with Doyle at the Marathon station and the $225.00 price to be charged for the drugs being sold to Doyle.

{¶87} In sum, as to both Count 1 and Count 2, the direct and circumstantial evidence identifying Metzger as the person supplying, transporting, and assisting in delivering the methamphetamine sold to the confidential informants, combined with the undisputed evidence of Metzger's presence at the time the transactions occurred, amounts to sufficient evidence supporting Metzger's convictions on both of those counts, particularly when that evidence is viewed in a light most favorable to the prosecution.

{¶88} As we find the evidence sufficient from which a rational trier of fact could find Metzger's guilt on Count 1 and Count 2 proven beyond a reasonable doubt, the third assignment of error is overruled.

{¶89} In the fourth assignment of error, Metzger utilizes the same arguments as in his third assignment of error, contending that his convictions for Aggravated Trafficking in Drugs on Counts 1 and 2 were against the manifest weight of the evidence as the state did not prove Metzger's involvement in those crimes.

**{¶90}** Based on the same evidence discussed above in our analysis of the third assignment of error, we determine that the jury did not clearly lose its way and create a manifest miscarriage of justice in resolving any conflicts in the evidence on Count 1 and Count 2.

**{¶91}** At trial, the State of Ohio presented testimony from several of the investigating officers, as well as that of both confidential informants involved in the case, in addition to numerous photographs and video recordings corroborating the eye-witness testimony. Upon consideration of the testimony of the state's witnesses, coupled with the evidentiary exhibits, we conclude that Metzger's convictions for Aggravated Trafficking in Drugs on Counts 1 and 2 were established in a firmly convincing fashion and were not outweighed by other evidence.

**{¶92}** While Metzger asserts on appeal that both confidential informants lacked credibility, the jury's apparent decision to believe the testimony of the informants does not indicate that the jury clearly lost its way. The jury was able to see, hear, and evaluate the testimony given by Mewhorter and Doyle, along with that of Paige Snider, and the jury was free to believe or disbelieve any or all of that testimony. *State v. Williams*, 2024-Ohio-2307, ¶ 27 (3d Dist.), citing *State v. Shockey*, 2024-Ohio-296, ¶ 24 (3d Dist.). A verdict is not against the manifest weight of the evidence just because the jury chose to believe the state's witnesses rather than the defense's version of the events. *State v. Hooper*, 2022-Ohio-2990, ¶ 29 (3d Dist.).

{¶93} In summary, we find that the jury did not lose its way in resolving conflicts in the evidence and this is not an exceptional case where the evidence weighed heavily against the convictions. As Metzger's convictions on Count 1 and Count 2 are not against the manifest weight of the evidence, the fourth assignment of error is also overruled.

*Fifth Assignment of Error*

{¶94} In the fifth assignment of error, Metzger argues that the trial court erred in failing to grant his Crim.R. 29 motion for acquittal on Count 4 of the indictment, in which Metzger was charged with – and ultimately found guilty of – Engaging in a Pattern of Corrupt Activity.

Crim.R. 29(A) provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

{¶95} "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, syllabus (1978).

{¶96} "An appellate court reviews the denial of a Crim.R. 29 motion for acquittal under the same standard used to review a sufficiency of the evidence

claim." *State v. Mejia*, 2020-Ohio-4883, ¶ 9 (3d Dist.). Thus, "'[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, paragraph two of the syllabus (1991). In making that inquiry, we must "'examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id.*

**{¶97}** In the instant case, Metzger was convicted on Count 4 of Engaging in a Pattern of Corrupt Activity in violation of R.C. 2923.32(A)(1), which provides that "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *."

**{¶98}** Pursuant to R.C. 2923.31(I)(2)(c), "corrupt activity" means "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" certain specified criminal offenses, which include drug trafficking, drug manufacturing, and any drug possession that is at least a fourth-degree felony. Pursuant to R.C. 2923.31(E), a "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they

-40-

constitute a single event." "Enterprise" is defined in R.C. 2923.31(C) and includes "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." "Enterprise" includes illicit as well as licit enterprises. *Id.*

{¶99} In the fifth assignment of error, Metzger first argues that the state failed to present any evidence that he sold or offered to sell drugs with regard to the trafficking charges in Counts 1 and 2. We find that claim to lack merit on the basis of the evidence discussed in our analysis of the third and fourth assignments of error, *supra*.

{¶100} Metzger also argues that the evidence was insufficient to prove that he was associated with any enterprise, as required to sustain a conviction for Engaging in a Pattern of Corrupt Activity.

{¶101} In *State v. Beverly*, 2015-Ohio-219 (2015), the Supreme Court of Ohio noted that the statutory definition of an enterprise is "remarkably open-ended." *Id.*, at ¶ 8. Moreover, "[n]othing in R.C. Chapter 2923 implies or explicitly states that an enterprise and a pattern of corrupt activity must be proved with separate evidence." *Id.* Additionally, "[i]t is easy to prove the existence of certain enterprises, especially those with licit purposes: there is a document memorializing the creation of a partnership or corporation, etc." *Id.*, at ¶ 9. However, "in most cases involving a RICO-type conviction, the existence of an enterprise is more

difficult to establish because the enterprise is entirely an 'association in fact,' i.e., a de facto enterprise" *Id.*, citing *U.S. v. Turkette*, 452 U.S. 576, 583 (1981). "An association-in-fact enterprise has been defined as 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* Put another way, "'an association-in-fact enterprise is simply a continuing unit that functions with a common purpose.'" *Beverly*, at ¶ 9, quoting *Boyle v. U.S.*, 556 U.S. 938, 948 (2009). Finally, "the existence of an enterprise, sufficient to sustain a conviction for engaging in a pattern of corrupt activity under R.C. 2923.32(A)(1), can be established without proving that the enterprise is a structure separate and distinct from a pattern of corrupt activity." *Beverly*, at ¶ 13.

{¶102} This Court addressed the proof necessary to establish association with an enterprise in *State v. Siferd*, 2002-Ohio-6801 (3d Dist.), where we noted in relevant part:

> Federal and state courts have generally defined the concept of being "associated with" an enterprise within the overall context of the statute, often concluding that a defendant has "associated with" an enterprise when he or she has "participate[d] in, directly or indirectly, the affairs of the enterprise." [See *State v*. Hughes, 1992 Ohio App. LEXIS 1245, 1992 WL 52472 (2d Dist. Mar. 13, 1992)]. In [*State v.*] *Schlosser*, [79 Ohio St.3d 329 (1997)], the Ohio Supreme Court described the level of association necessary to support an R.C. 2923.32(A)(1) conviction in a broad sense, indicating that the state "had to prove that each defendant was *voluntarily connected* to the pattern [of corrupt activity comprising the enterprise], and performed two or more acts in furtherance of it." *Schlosser*, at 334 (emphasis added)]. Again, "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise. * * * Direct evidence of agreement is unnecessary: 'proof of such an

agreement may rest upon inferences drawn from relevant and competent circumstantial evidence, ordinarily the acts and conduct of the alleged conspirators themselves.' Additionally, once the conspiracy had been established, the government need show only 'slight evidence' that a particular person was a member of the conspiracy. Of course, a 'party to the conspiracy need not know the identity, or even the number, of his confederates.'" [*U.S. v. Elliott*, 571 F.2d 880, 903 (1978)].

*Id.*, at ¶ 40.

Additionally, as the Supreme Court of Ohio stated in *State v. Brown*, 2025-Ohio-2804:

One way the State can show that a person was employed by or associated with an enterprise is by showing that the person entered into a conspiracy with another person who was a member of that enterprise. See *United States v. Godwin*, 765 F.3d 1306, 1323 (11th Cir. 2014), citing *United States. v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007). That is because an associated-in-fact enterprise "shares important characteristics with the traditional conspiracy of criminal law." *United States v. Griffin*, 660 F.2d 996, 999 (4th Cir. 1981). A person who merely agrees "to participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity brings [him or her] within the conspiracy." *United States v. Gonzalez*, 921 F.2d 1530, 1540 (11th Cir. 1991).

Of course, not all drug sales involve a conspiracy. See *United States v. Bostick*, 791 F.3d 127, 139, 416 U.S. App. D.C. 304 (D.C.Cir. 2015). Someone who buys drugs from another person but does not have an agreement with that person to resell the drugs has not formed a conspiracy with the seller. See *United States v. Brown*, 726 F.3d 993, 1001 (7th Cir. 2013).

But when a buyer agrees with the seller to distribute the drugs that the buyer purchased, a conspiracy forms because "there is an agreement beyond the mere sale for personal consumption." *United States v. Kozinski*, 16 F.3d 795, 808 (7th Cir. 1994).

The United States Court of Appeals for the Sixth Circuit has recognized that the trust involved in selling drugs on credit (i.e., "fronting" drugs) "suggests more than a buyer-seller arrangement" between the parties to the transaction. *United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996). Ultimately, "evidence of fronting coupled with evidence of repeat drug purchases is sufficient 'to distinguish a conspiracy from a nonconspiratorial buyer-seller relationship.'" *United States v. Gallegos*, 784 F.3d 1356, 1360 (10th Cir. 2015), quoting *United States v. Johnson*, 592 F.3d 749, 755, fn. 5 (7th Cir. 2010).

*Id.*, at ¶¶ 21-24.

**{¶103}** In the instant case, contrary to Metzger's position on appeal, there was sufficient evidence presented at trial to establish his involvement in, and association with, an enterprise engaged in a pattern of corrupt activity to the extent necessary to withstand his challenge pursuant to Crim.R. 29.

**{¶104}** Based on the trial evidence detailed previously in this opinion, a pattern of corrupt activity through drug possession and drug trafficking was clearly proven. There was also evidence serving to establish that Metzger had been engaged in an ongoing business of trafficking in drugs to more than one individual. Furthermore, the testimony of Paige Snider and the various text messages introduced in evidence reflected that Metzger's drug dealing was assisted by, and done in conjunction with, Snider and Mark Ruvoldt, at a minimum. Such evidence served to establish an association-in-fact enterprise, however loosely organized, with which Metzger was associated and with the support of which he engaged in the pattern of corrupt activity at issue.

{¶105} Accordingly, upon applying the relevant statutory definitions and case law to the facts presented in evidence in this case, we find with regard to the fifth assignment of error that there was sufficient evidence presented at trial, when viewed in a light most favorable to the prosecution, upon which any rational trier of fact could have found the essential elements of Engaging in a Pattern of Corrupt Activity proven beyond a reasonable doubt.

{¶106} The fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶107} In the sixth assignment of error, Metzger argues that the trial court erred in permitting prosecution witness Kelsie Pestello, a forensic scientist in the drug chemistry section of the Ohio Bureau of Criminal Investigation ("BCI"), to testify as an expert.

{¶108} With regard to this claim, the record reflects that the prosecution called Pestello as a witness at trial in order to provide testimony as to the nature and weight of the substance alleged to be methamphetamine in Count 1 of the indictment, after Pestello had performed chemical testing and instrumental analysis on that substance, in addition to weighing it.

{¶109} When initially called to the stand, Pestello testified on direct examination that she had been employed by BCI for two years as a forensic scientist in the drug chemistry section, and that her duties included analyzing evidence for the presence or absence of controlled substances, weighing such evidence, writing

reports, and testifying in court. Pestello testified that she has a Bachelor of Science degree in chemistry, with a minor in criminal justice, from The Ohio State University, and also a Master of Science degree in chemistry from Ohio University. In addition to her educational background, Pestello had undergone eight months of specialized on-the-job training at BCI, which specifically focused on the analysis of controlled substances. Pestello testified that she had performed controlled substance analysis "hundreds and hundreds" of times, and that she had been qualified on one prior occasion to testify in court as an expert in the area of controlled substance analysis. Pestello confirmed that she also undergoes annual proficiency testing at her job.

{¶110} After eliciting that information from Pestello on the stand, the prosecution requested of the trial court that Pestello be deemed qualified to testify as an expert in the area of controlled substance analysis. In response, defense counsel requested that he be permitted to voir dire Pestello on her qualifications before the trial court ruled on the state's request, which the trial court permitted.

{¶111} Defense counsel then examined Pestello at great length, asking detailed questions relating to the testing processes used to identify a substance as methamphetamine and pressing Pestello to explain the inner workings of a gas chromatograph-mass spectrometer ("GC-MS"), which is an analytical instrument that separates complex chemical mixtures and then identifies and quantifies the individual components, in order to assist in the identification of the substance. In

response to that questioning, Pestello testified as to the laboratory procedures that she follows in her job, including her use of a GC-MS and the manner in which she analyzes the data produced from that instrument following the instrumental analysis. Pestello explained in general terms the manner in which a GC-MS operates internally, and the principles of gas chromatography-mass spectrometry, but her testimony reflected some limitations in her knowledge of the most technical aspects of the instrument's internal design and operation.

{¶112} Following that voir dire, defense counsel objected to Pestello being qualified as an expert witness. The trial court overruled that objection, and permitted Pestello to testify as an expert with regard to controlled substance analysis.

{¶113} After being so qualified by the trial court, Pestello then testified on direct examination as to the weighing and testing that she had performed on the substance submitted to her. Ultimately, Pestello testified that the substance previously identified as having been purchased during the first buy on February 22, 2024, was found to weigh 56.5 grams, plus or minus .05 grams, and was found to contain methamphetamine following the chemical testing and instrumental analysis Pestello performed on the substance. Pestello was then subjected to a lengthy and detailed cross-examination, which included more questions about the instrumental analysis done with the GC-MS and the review of the data performed by Pestello afterwards. During cross-examination, Pestello was also asked if she knew the

chemical structure of methamphetamine, or how many ions are present in methamphetamine, to which Pestello responded that she did not have that information committed to memory.

{¶114} On appeal, Metzger asserts that the trial court should not have permitted Pestello to testify as an expert witness. Specifically, while Metzger concedes that Pestello was knowledgeable in general forensic chemistry, he argues that she failed to demonstrate expertise in the identification of methamphetamine and, in particular, was not familiar with the inner workings of a GC-MS.

Evid.R. 702 governs testimony by experts, and provides as follows:

A witness may testify as an expert if the proponent demonstrates to the court that it is more likely than not that all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information and the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶115} The determination of whether a witness possesses the qualifications necessary to provide expert testimony lies within the sound discretion of the trial court, and the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of discretion on the trial court's part. *State v. Maupin*, 42 Ohio St.2d 473, 479 (1975). An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶116} In the instant case, our review of the record does not reflect an abuse of discretion on the part of the trial court in permitting Pestello to testify as an expert. As noted, prior to the court so ruling, the witness testified at length about her educational and professional background, her experience testing and analyzing controlled substances, and the proficiency required by the lab for which she works. Pestello further testified that she had conducted hundreds of controlled substance analyses, and had previously been qualified to provide expert testimony about the same in court. In sum, the witness demonstrated the educational background, professional experience, and specific training in controlled substance analysis to permit her to provide expert testimony on that topic pursuant to Evid.R. 702.

{¶117} Moreover, we note that it is generally accepted that an expert witness is not required to be the best witness on the issue in order to be qualified to testify. *Alexander v. Mt. Carmel Medical Center*, 56 Ohio St.2d 155, 159 (1978). In the case before us, the witness's inability to explain the chemical structure of methamphetamine off the top of her head, or to similarly detail the internal intricacies of an instrument she uses, does not establish that the witness lacked the "specialized knowledge, skill, experience, training, or education" required by Evid.R. 702(B).

{¶118} For those reasons, the trial court did not abuse its discretion in accepting Pestello as an expert witness when so proffered by the prosecution.

{¶119} The sixth assignment of error is overruled.

*Conclusion*

{¶120} Having found no error prejudicial to the defendant-appellant, Shawn Metzger, in the particulars assigned and argued, the judgment of conviction and sentence entered in the Allen County Court of Common Pleas is affirmed.

***Judgment affirmed***

**ZIMMERMAN, P.J., and MILLER, J., concur.**

Case No. 1-25-19

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

 

 

Juergen A. Waldick, Judge

 

 

William R. Zimmerman, Judge

 

 

Mark C. Miller, Judge

DATED:
/jlm